# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

NGCOBA ATKINS,

                           Plaintiff,            6:20-CV-1217 (ATB)

      -v.-                                     (Lead Case)

WALMART, INC.,                        6:20-CV-1218 (ATB)

                       Defendant.       (Member case)

_____

NGCOBA ATKINS,  Plaintiff Pro Se
DANIEL J. MOORE, ESQ., Attorney for the Defendant

ANDREW T. BAXTER, United States Magistrate Judge

### MEMORANDUM-DECISION AND ORDER

Plaintiff filed two employment discrimination actions against defendant on October 5, 2020, which were consolidated into the above-captioned lead case by Decision and Order dated November 2, 2020.  (Case No. 6:20-CV-1217, Dkt. Nos. 1, 7; Case No. 6:20-CV-1218, Dkt. Nos. 1, 5).[1]  The consolidated case was assigned to me to conduct all proceedings, by Order of U.S. District Judge Brenda K. Sannes, with the consent of both parties, on February 3, 2021.  (Dkt. No. 31).  Presently before this court are the papers related to plaintiff's motion for summary judgment (Dkt. Nos. 81 (motion), 84 (response), 86 (reply)); as well as the papers related to defendant's motion for summary judgment (Dkt. Nos. 82 (motion), 85 (response), 90 (reply)).

## I.  **Background**

Plaintiff, Ngcoba Atkins, was employed by Walmart as a full-time loader in the

_____

[1] After the cases were consolidated, all filings were made in the lead case, No. 6:20-CV-1217, so all further references to docket numbers relate to the lead case.

Shipping Department at Distribution Center #6038 ("DC6038") in Marcy, New York, from October 4, 2016 through January 14, 2020, when he was terminated. (Def.'s Statement of Material Fact ("SMF") ¶¶ 2, 3, 85, Dkt. No. 82-1).[2]  Plaintiff filed complaints of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("NYSDHR") against Walmart on October 23, 2019 and on May 14, 2020. (Def.'s Exs. 33 & 34, Dkt. No. 82-2 at 230-34). On September 9, 2020, the EEOC advised plaintiff that it was "unable to conclude that the information obtained establishes violations," and advised him of his right to sue in federal or state court. (Def.'s Exs. 35 & 36, Dkt. No. 82-2 at 235-40).

## A.    The Complaints

The controlling complaints in this case are docketed as plaintiff's Second Amended Complaint ("SAC"). (Dkt. No. 44). The pro se plaintiff's two overlapping complaints both list the bases for employment discrimination as race, religion, national origin, and "other protected activity." (SAC, Dkt. No. 44 at 2, 8 (¶¶ 6(a), (b), (d) and (f)). Plaintiff identifies as a "Black Jew." (Pl.'s Response to Defendant's SMF ¶ 17, Dkt. No. 85). In the complaint in the lead case, plaintiff states that the defendant's "conduct" involved termination, unequal terms and conditions, retaliation, and "failure to accommodate, removal of accommodation[;] pretextual termination, dishonest explanation." (Dkt. No. 44 at 3, ¶ 7). In the member case complaint,

---

[2] Going forward, to the extent a party materially dispute SMFs of the other side, the court will so note.

plaintiff states that the defendant's "conduct" involved failure to promote, unequal terms and conditions of employment, reduction in wages, retaliation, and "failure to accommodate, removal of accommodation[;] dishonest explanation." (*Id.* at 8,  ¶ 7(C), (D), (E), (F) and (G)).[3]

## 1.    The Lead-Case Complaint

In the lead-case complaint, plaintiff alleges that in June or July of 2018, defendant Walmart first introduced the "StrongArm/Fuse" (hereinafter "StrongArm") device at DC6038.[4]   (*Id.* at 3, ¶ 8 (FACTS)).  Plaintiff alleges that, "in the beginning of the pilot," he requested an exemption from wearing the device "for medical reasons."  He further claims that, after obtaining "medical documentation" and providing it to Manager Anne McRedmond, he was not required to wear the device, as an "accommodation."  (*Id.*)

Plaintiff claims that, in July of 2019, he filed a charge of racial and religious discrimination and retaliation with the EEOC against Walmart.  (*Id.*)  However, plaintiff also acknowledges that he signed the "official EEOC charge" on October 23, 2019.  Within one week of signing the EEOC complaint, he was told by manager Tom Christiano that plaintiff's medical accommodation with respect to the StrongArm device was no longer going to be honored.  (*Id.*)  Mr. Christiano allegedly told

---

[3] The member-case complaint also makes several references to a hostile work environment.  (*Id.* at 12, 13).

[4] This device is worn by the employee and tracks motion throughout the day, allowing the company to identify safety risks, and provides a dashboard of performance and safety over time. *See* https://www.strongarmtech.com/fuse.

plaintiff that there was no medical documentation in his file supporting an accommodation, and that plaintiff would have to go through ADA (Americans with Disabilities Act) procedures.  (*Id*.)  Plaintiff states that these "actions" were "a pretext for termination." (*Id*.)

Plaintiff claims that on January 6, 2020 he requested that the EEOC "return" his charge to investigation, after the defendant delayed mediation for one month.  Plaintiff states that on January 7, 2020, he "clocked in" for his regular shift, but was one of the employees who volunteered to go home that day due to "low freight." (*Id*.) Plaintiff went on an approved vacation from January 7, 2020 through January 13, 2020.  *(Id*.) On January 14, 2020, when he returned to work, he was stopped at the door by Mike Copperwheat, who stated that he wished to speak with plaintiff before he began his workday.  (*Id*.)

Plaintiff states that the "meeting" with Mr. Copperwheat was actually an "exit interview," demanding that plaintiff wear "the device" or be terminated.  (*Id*.) Plaintiff states that he remained adamant about not wearing the device, but asked to be transferred to another position where wearing the StrongArm device was not required. He suggested the position of "yard driver," for which he was qualified.  This request was denied, and he was terminated from his employment with Walmart.  (*Id*.)  Plaintiff states that, at the end of the meeting, he asked Mr. Copperwheat why he was being terminated at that time, rather than being allowed to take advantage of the company policy which allowed for three disciplinary infractions prior to termination.  (*Id*.) Plaintiff claims that defendant Walmart continued to retaliate against him after

4

termination by delaying his receipt of unemployment benefits.  (*Id*.)

Plaintiff lists three causes of action in his lead-case complaint, all alleging "retaliation" against him for making claims to the EEOC. (Dkt. No. 44 at 5-6) (Causes of Action)).  His statement of claims, however, also references a hostile work environment.  (*Id*.)

### 2.    The Member-Case Complaint

In the member-case complaint, plaintiff states that on June 1, 2018, he began wearing "fringes" on his shirts as representative of his faith.  (SAC, Dkt. No. 44 at 9, ¶ 8(1) ("FACTS")).  Plaintiff alleges that, in July of 2018, while he was working as a "T3 Trainer,"[5] plaintiff reported, to management, that he had been advised about an act of racism against him that was witnesses by a trainee.  Plaintiff claims that, after this report, he was demoted from T-3 trainer and never given any forklift assignments again.  (*Id*.)

Plaintiff alleges that he made a request for a "religious" scheduling accommodation in October of 2018, which was denied in November of 2018, without a showing that the accommodation was an "undue burden." (*Id*., ¶ 8(3)).  He states that when he began trying to "dispute" the decision in November of 2018, he was singled out and disciplined as the sole individual responsible for destroying some freight, even though there were five people involved in the incident.  (*Id*., ¶ 8(4)).

Plaintiff made another request for a scheduling accommodation in February of 2019, which was denied on March 1st–a decision he questioned and disputed.  (*Id*., ¶

---

[5] Walmart refers to the position as "T-3 Trainer" and I will use that nomenclature.

8(7)).  Plaintiff states that he was overlooked for cross-training positions in February of 2019.  (*Id*., ¶ 8(6)).  He also claims that he was denied permission to complete an online application for a managerial position in April of 2019.  (*Id*., ¶ 8(8)).  Plaintiff appears to allege that he was allowed to apply for other positions, but not for the management position.  (*Id*., ¶¶ 8(8)-8(12)).  Plaintiff allegedly was told that there was no record of a management application, that the management application had been "withdrawn," and then, that he had "failed" an assessment.  (*Id.,* ¶¶ 8(11)-(12)).

The member-case states that, on August 1, 2019, he made a second complaint about racism against him by "manager" R.Q.[6]  (*Id*., ¶ 8(13)).  Plaintiff was then asked to finish his shift that day in the "yard" of the distribution center.  He left early the next day, using his personal time, because he felt "tension from the management." (*Id*.)  When plaintiff returned to work, on August 6 and on August 7, he discovered that he received "unwarranted" disciplinary "write ups" for time and attendance violations.  (*Id*.)  Plaintiff alleges he received another unwarranted "write up" on August 13, 2019.  (*Id*.)  Some of the disciplinary actions were removed from plaintiff's record or mitigated after he met with "general manager Larry [Raike]."  (*Id*., ¶ 8(14)).  However, plaintiff realized, on October 22, 2019, that the disciplinary "points" that had been removed from his disciplinary record by manager Larry were added back into his "attendance Matrix."  (*Id*., ¶ 8(16)).  Plaintiff again spoke with manager Larry, who agreed to remove the extra points so that plaintiff would be

---

[6] The complaint references R.Q. by name.  As discussed below, Walmart clarified that R.Q. was not a management-level employee and the court is referring to non-management employees throughout by their initials, to protect their privacy.

eligible for a "Warehouse incentive bonus check." (*Id.*, ¶ 8(17)).[7]

The first cause of action in the member-case complaint alleges retaliation for reporting workplace racism, referencing his removal as a certified trainer and the loss of forklift assignments and cross-training opportunities. (SAC, Dkt. No. 44 at 11, ¶ 9). The second cause of action also claims retaliation, referencing the allegedly unwarranted disciplinary actions. (*Id.*) The third cause of action asserts further retaliation, stating that, after reporting the racial and religious discrimination, his "medical accommodation" was revoked, ultimately leading to his termination. (*Id.*, Dkt. No. 44 at 12). The fourth cause of action alleges religious discrimination relating to his request for a scheduling accommodation. (*Id.*, Dkt. No. 44 at 12). The fifth cause of action claims "defamation" relating to disparaging statements about him made by co-workers, which he reported to management. (*Id.*, Dkt. No. 44 at 12-13).

The sixth cause of action in the member-case complaint again references plaintiff's issues relating to the StrongArm device, but also associates this with an ADA claim that he was improperly denied a medical accommodation exempting him from wearing the device. (*Id.*) Plaintiff's seventh and final cause of action alleges failure to promote based on race discrimination. (Dkt. No. 44 at 13). Plaintiff claims that he was denied the permission to file an online application for a management position. Plaintiff was told that he had to apply in person, but then the application was

---

[7] The member case-complaint also discusses the September 19, 2019 "return" of the StrongArm device, the denial of plaintiff's prior exemption from wearing that device, and his ultimate termination. (Id., ¶¶ 8(2), 8(15), (18)). These allegations track those stated in the lead-action complaint, discussed above.

"withdrawn" by management, without notice to the plaintiff.  The position plaintiff sought was filled by a white woman, who happened to be the daughter of the maintenance manager.  Plaintiff claims that the defendants were motivated to keep management "right and whi[te]."  (*Id*.)

Plaintiff, in his second amended complaint, added citations to his claims of discrimination, harassment, and retaliation, referencing violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., including the anti-retaliation provisions in 42 U.S.C. §§ 2000e-3; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 et seq.; and the Americans with Disability Act ("ADA"), 42 U.S.C. §§ 12101 et seq.  Plaintiff further contends that, by the same conduct, Walmart also committed violations of Title I of the Civil Rights Act of 1964 ("Title I"), 52 U.S.C. §§ 10101 et seq.; Title V of the Civil Rights Act of 1964 ("Title V"), 42 U.S.C. §§ 1975 et seq.; the New York Labor Law ("NYLL") §§ 203-e and 239; "NY HRL Bill- 07797"; and "defamation laws."

**B.    The Positions of the Parties**

In his summary judgment motion, plaintiff argues that, based on the undisputed facts, he is entitled to judgment against Walmart on his claims, as a matter of law. (Pl.'s 10/27/21[8] Motion for Summary Judgment at 4, Dkt. No. 81-1).  He contends that "Walmart has repeatedly taken adverse actions against Mr. Atkins directly following different incidents of asserting his rights and engaging in lawful protected activities, . .

---

[8] To avoid confusion, the court will refer to the date of filing of plaintiff's submissions, which were sometimes signed and dated on earlier dates.

. which ultimately resulted in his unlawful termination . . . for allegedly refusing to wear Strong[A]rm device, which he already was accommodated for before revoking of accommodation after signing EEOC charges against them."  (*Id.*)

Defendant contends that, as a matter of law and undisputed fact, none of plaintiff's claims of discrimination, harassment, and retaliation have merit, and summary judgment should be granted for the following reasons:

> (1) with respect to Plaintiff's failure to accommodate claim based on religion, Walmart made a reasonable accommodation that eliminated the conflict between Plaintiff's religious practices and his work schedule, and no adverse employment action was taken against Plaintiff on account of his religion; (2) the harassment claim fails because (a) the alleged behavior was not "because of" Plaintiff's race, color, or national origin, (b) even if such behavior was motivated by Plaintiff's race, color, or national origin, it was neither "severe" nor "pervasive" as a matter of law, and (c) in any event, Walmart cannot be held liable for the alleged harassing conduct because it maintains policies providing multiple avenues for reporting concerns, and when Plaintiff's reported the conduct, Walmart investigated and responded; (4) the failure to promote claim based on race fails because Plaintiff cannot demonstrate that he was qualified for the management position he sought; (5) the claim of disability discrimination must be dismissed because (a) Plaintiff cannot establish that he is qualified for protection under the applicable law and, (b) even if qualified, it was Plaintiff who was responsible for the breakdown of the interactive process; and (6) with respect to Plaintiff's claims of retaliation, he has not and cannot establish a causal connection between any alleged protected activity and any alleged adverse action. Plaintiff's parallel state law claims, to the extent they are not dismissed on the same substantive bases as their federal counterparts, should be dismissed because the Court should decline to consider pendent state claims following the dismissal of all federal claims.

> Finally, Walmart is entitled to summary judgment with respect to the conclusory assertions that Walmart violated Title I, Title V, the NYLL, NY HRL Bill-07797, and "defamation laws" because Plaintiff fails to allege facts sufficient to support cognizable legal claims.

(Def.'s 11/4/21 Mem. of Law at 1-2, Dkt. No. 82-3 at 9-10).  The court will address the defendant's supporting statement of "undisputed" material facts in connection with the analysis of plaintiff's various claims.

Each party obviously opposes the summary judgment motion of the other side on the merits, to the extent they address essentially the same legal and factual issues. However, the parties also object to the court's consideration of certain allegations or evidence submitted by their opponents on various grounds, and assert that the other party failed to comply, in certain respects, with the procedural requirements for summary judgment motions.

Because the competing summary judgment motions overlap substantially, the court will, for the most part, address them together.  For the reasons stated below, the court concludes that, based on the undisputed, or indisputable, admissible evidence of record, no rational fact finder could conclude that plaintiff's various employment discrimination claims are supported in law.  Accordingly, plaintiff's summary judgment motion (Dkt. No. 81) will be denied, defendant's summary judgment motion (Dkt. No. 82) will be granted, and plaintiff's complaints will be dismissed, in their entirety.

## II.    <u>Generally Applicable Law</u>

### A.    **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263,

272-73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Lastly, Fed. R. Civ. P. 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials– including the facts considered undisputed–show that the movant is entitled to it."[9]

If the moving party satisfies its burden to show the absence of disputed material

---

[9] *See Payne v. Cornell Univ.*, No. 21-109-CV, 2022 WL 453441, at *1 (2d Cir. Feb. 15, 2022). "Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that movant is proceeding pro se." *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 209 (N.D.N.Y. 2008); *Evans v. Albany Cty. Corr. Facility*, No. 9:05-CV-1400 (GTS/DEP), 2009 WL 1401645, at *6 & n.35 (N.D.N.Y. May 14, 2009) (collecting cases).

facts, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

"The district court considering a summary judgment motion . . . must . . . be 'mindful of the underlying standards and burdens of proof . . .'" *U.S. S.E.C. v. Meltzer*, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (citations omitted). Where a plaintiff is moving for summary judgment, he bears a much greater initial burden and "must show that the evidence supporting its claims is so compelling that no reasonable jury could return a verdict for the defendant." *Id.* Accord, *McCarthy v. Wachovia Bank, N.A.*, 759 F. Supp. 2d 265, 273 (E.D.N.Y. 2011).

Credibility assessments and the choice between conflicting versions of a story are generally for a jury to resolve. *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir. 1996). However, the Second Circuit recognized an exception to this rule in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). In *Jeffreys*, the court held that summary judgment may be granted in the rare case, "where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable

to the plaintiff, the court determines that 'no reasonable person' could credit . . . his testimony." *Quick v. Quinn*, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at *4 (N.D.N.Y. Sept. 11, 2014) (quoting *Jeffreys*, 426 F.3d at 554-55).

In order for the court to apply the *Jeffreys* exception, the defendant must satisfy each of the following: (1) "the plaintiff must rely 'almost exclusively on his own testimony,'" (2) "the plaintiff's "testimony must be 'contradictory or incomplete,'" and (3) "the plaintiff's testimony must be contradicted by evidence produced by the defense." *Id.* (quoting *Benitez v. Ham*, No. 04-CV-1159 (NAM/GHL), 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (*adopting report and recommendation*) (quoting *Jeffreys*, 426 F.3d at 554)).

### B.    McDonnell-Douglas Burden-Shifting Analysis

Plaintiff claim's, which are primarily rooted in alleged violations of Title VII, the ADA and the NYSHRL, must, in general, be analyzed under the burden-shifting analysis articulated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff is first obligated to establish a prima facie case of discrimination or retaliation.  If the plaintiff is able to sustain that burden, the employer must then "produce" (not prove) a legitimate and non-discriminatory (or non-retaliatory) rationale for any adverse actions taken toward the plaintiff.  The burden then shifts back to the plaintiff to prove that the legitimate rationale offered up by the employer is, in fact, a pretext, unworthy of belief and offered up as "cover" for prohibited discrimination.  Only when the plaintiff meets this burden can he sustain a claim for discrimination or retaliation in the context of a summary judgment motion.

*See generally McDonnell Douglas Corp.*, 411 U.S. 792, 802-03; *Payne v. Cornell Univ.*, 2022 WL 453441, at *2. "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Borzon v. Green*, 778 F. App'x 16, 18 (2d Cir. 2019) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

## III. Procedural Challenges to the Summary Judgment Motions

### A. Plaintiff's Objections Under N.D.N.Y. L.R. 7.1(c)

At the Rule 16 conference on February 1, 2021, the court set a deadline of November 5, 2021, for the filing of dispositive motions. (Dkt. No. 29). Plaintiff filed his summary judgment motion on October 27th, triggering a response deadline of November 18th (Dkt. No. 81); and defendant filed its summary judgment motion on November 4th, triggering a response deadline of November 26th (Dkt. No. 82). The opposing parties proceeded to file separate, timely responses to each other's motions–defendant filing on November 17th (Dkt. No. 84), and plaintiff filing on November 26th (Dkt. No. 85).

In his response to defendant's summary judgment motion, plaintiff claimed that defendant's summary judgment motion should be considered a "cross motion." Plaintiff argued that, pursuant to N.D.N.Y. L.R. 7.1(c), defendant should have briefed its motion and its opposition to plaintiff's motion in one 25-page brief and responded to the statement of facts in plaintiff's motion in the initial defense submission. Local Rule 7.1(c) states, in pertinent part:

A party may file and serve a cross-motion (meaning a request for relief that

14

competes with the relief requested by another party against the cross-moving party) at the time it files and serves its opposition papers to the original motion, i.e., not more than TWENTY ONE DAYS after service of the motion, unless otherwise ordered by the Court. If a party makes a cross-motion, it must join its cross-motion brief with its opposition brief, and this combined brief may not exceed twenty-five (25) pages in length, exclusive of exhibits. A separate brief in opposition to the original motion is not permissible.

This Local Rule appears to address the situation where only one party files a summary judgment motion by the dispositive motion deadline, and the opposing party waits until the response deadline to file, not only its opposition to the other side's motion, but a cross-motion seeking competing relief. The Local Rule limits the briefing of the responding party, presumably so as not to give it a unfair advantage as a result of waiting to see the other's side's motion before making its own.

In this case, both parties chose to file initial summary judgment motions by the dispositive motion deadline, but the pro se plaintiff chose to file his motion nine days early. The defendant filed its motion one day before the deadline for filing initial dispositive motions, and two weeks before the deadline for responding to plaintiff's motion. The defendant's initial motion papers met all the requirements of an original summary judgment motion and did not respond, in any way, to plaintiff's motion. By the deadline for responding to plaintiff's motion, defendant filed a response, including a specific response to the statement of facts in plaintiff's motion. (Dkt. No. 84). The plaintiff had the same opportunity as defendant to fully brief both motions, and then proceeded to file additional submissions, without obtaining the required authorization

from the court.  (See Dkt. Nos. 91, 93).[10]

It would be incongruous to allow the plaintiff to file a dispositive motion before the applicable deadline and to thereby deprive the defendant of its right to fully pursue its own timely motion, and to oppose plaintiff's motion.  This court does not believe that Local Rule 7.1(c) intended that result, and finds that plaintiff has no basis to object to the defendant's full briefing of the each side's summary judgment motion. The plaintiff's reliance on *Meaney v. CHS Acquisition Corp.*, 103 F. Supp. 2d 104, 109 (N.D.N.Y. 2000) (Dkt. No. 85 at 3-4), does not persuade me otherwise, as that case involved egregious violations of other aspect of Local Rule 7.1 not present in this case, such the failure of a cross motion to controvert, with specificity, the facts set forth in the movant's Statement of Material Facts.

## B.    Defendant's Procedural Objections to Plaintiff's Submissions

Defendant objects to plaintiff's summary judgment motion and much of the evidence submitted in support of plaintiff's motion and in opposition to the defense motion.  Defendant contends that the Statement of Facts in plaintiff's motion (Dkt. No. 81-1 at 5-10) "reads as a hodge podge of allegations, many of which are conclusory, and very few of which are supported by citations to affidavits, testimony or other record evidence."  (Def.'s 11/17/21 Mem. of Law at 5, Dkt. No. 84-4 at 11).  As

---

[10] To stop the filing of any further unauthorized motion papers, the court entered a text order on December 20, 2021 stating it "will not consider any further submissions from the parties until the cross motions for summary judgment are resolved."  (Dkt. No. 94).  Unfortunately, the court's generic use of the term "cross motion" in that text order did not reflect the precise provisions of Local Rule 7.1(d), which then triggered a further submission from plaintiff.  (See Dkt. Nos. 95, 96).

defense counsel argues, "[t]he deference owed to pro se litigants . . . does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules" regarding summary judgment motions. *Ford v. Martuscello*, No. 9:14-CV-1566 (DNH/DEP), 2017 WL 4181385, at *4 (N.D.N.Y. July 20, 2017), *report and recommendation adopted*, 2017 WL 4155358 (N.D.N.Y. Sept. 18, 2017).

Defense counsel objects that many of the exhibits offered by plaintiff in connection with both summary judgment motions are inadmissible and objectionable because, *e.g.* they lack foundation, are not based on personal knowledge of the source of the information, are irrelevant, or constitute hearsay. (Def.'s 11/17/21 Objections to Plaintiff's Evidence, Dkt. No. 84-3; Def.'s 12/6/2021 Objections to Plaintiff's Evidence, Dkt. No. 90-1; Defendant's 12/15/21 Objections to Plaintiff's Evidence, Dkt. No. 92). Declarations or statements which "contain[] hearsay, conclusory assertions not based on personal knowledge, and statements contradicted by [plaintiff's] own previous deposition testimony" may be disregarded, in the discretion of the judge reviewing a summary judgment motion. *Payne v. Cornell Univ.*, No. 18-CV-1442 (GTS/ML), 2021 WL 39684, at *14 (N.D.N.Y. Jan. 5, 2021), *aff'd*, No. 21-109-CV, 2022 WL 453441 (2d Cir. Feb. 15, 2022).

The defense also objects to certain recordings of meetings with Walmart officials submitted by plaintiff because they were not produced in discovery, and seeks sanctions, including evidence preclusion under Fed. R. Civ. P. 26(a) & 37. As stated in *Techky v. City of New York*, No. 98 Civ 7643, 2000 WL 48862, at *2 (S.D.N.Y. Jan. 20, 2000):

Federal Rule of Civil Procedure 37(b) and (c) provides that, if a party fails to comply with a discovery order or fails to disclose information, the Court may impose any sanction 'as are just' and authorized under Rule 37(b)(2)(A), (B), and (C).  These sanctions include precluding a party from introducing certain matters into evidence, striking pleadings or parts thereof, or to dismiss the action.  Fed. R. Civ. P. 37(b)(2)(B), (C). . . .

"Fed. R. Civ. P. 37(d) allows the impositions of sanctions against a party for serious disregard of the obligations imposed by the federal discovery rules even though the party has not violated any court order." *Burnett v. Venturi*, 903 F. Supp. 304, 308 (N.D.N.Y. 1995).  *See also Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-107 (2d Cir. 2002) ("Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs.").  "Although preclusion of evidence and dismissal of an action are harsh remedies and should be imposed only in rare situations, they sometimes are necessary to achieve the goals of Fed. R. Civ. P. 37 as a credible deterrent rather than a 'paper tiger.'" *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir. 1979).  Rule 37(d) "applies even in cases not rising to the level of willfulness" and can apply in the context of negligent or reckless failures to meet discovery obligations. *Burnett v. Venturi*, 903 F. Supp. at 308.  However, "[t]he presence or absence of willfulness does remain relevant in the choice of sanction . . . ." *Id*. (citation omitted).

Much of the voluminous material presented by plaintiff in connection with the summary judgment motions is not material to the claims in this case, notwithstanding the fact that plaintiff went to great lengths to try to document that he was the victim of

employment discrimination, by among other things, surreptitiously recording numerous conversations with his managers.  So, rather than rule on all of the defense objections at the outset, the court will consider what statements and other evidence proffered by plaintiff should be deemed relevant and admissible when addressing particular, alleged disputed issues of material fact.

In general, however, the court will decline to review the substantial number of un-transcribed audio recordings submitted by plaintiff absent a very specific reference in plaintiff's papers as to how and where the specific portion of the conversation upon which he was relying could be located.  Furthermore, plaintiff made a number of references to materials submitted in connection with proceedings before the EEOC without submitting copies of the relevant materials, which were not readily available to the court, and which will not be considered.

IV.   **Plaintiff's Religious Accommodation Claim**

Plaintiff argues that he was denied a reasonable accommodation by Walmart when he requested not to work from sundown on Fridays through sundown on Saturdays for religious reasons.  Defendant contends that Walmart offered, and plaintiff ultimately accepted, a reasonable accommodation that did not require him to work on his purported "Sabbath."

A.   **Applicable Law**

A claim based on failure-to-accommodate an employee's religious practices requires the plaintiff to show the following three elements:  (1) he held a bona fide religious belief conflicting with an employment requirement; (2) he informed his

employer of this belief; and (3) he was subject to an adverse employment action for failure to comply with the conflicting employment requirement.  *Brooks v. City of Utica*, 275 F. Supp. 3d 370, 379-80 (N.D.N.Y. 2017).  If the plaintiff can establish a prima facie case, "the inquiry turns to whether the employer complied with the statutory requirement to offer the plaintiff a reasonable accommodation for his or her religious belief, unless doing so would cause the employer to suffer an undue hardship."  *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 391, 399 (S.D.N.Y. 2017).  *See also Horsey v. ADT LLC*, 5:17-CV-1356 (GTS/ML), 2020 WL 554390, at *8, 2020 U.S. Dist. LEXIS 17522, at *21 (N.D.N.Y. Feb. 4, 2020).

### B.    Analysis

Plaintiff requested not to work on Saturdays–his "Sabbath"–in October of 2018 and again in February of 2019.  During that time, he was assigned to work the full-time weekend shift (Saturdays, Sundays, and Mondays from 5:15 a.m. through 5:45 p.m.), for which Walmart provided shift differential pay.  (Def.'s SMF ¶¶ 14, 15, 26, 34).  Pursuant to Walmart's religious accommodation policy, Human Resources ("HR") Manager Maureen Sheedy engaged in a dialogue with plaintiff and offered him a number of possible accommodations.

Plaintiff initially declined all suggested accommodations, including (1) a flexible schedule to allow plaintiff's ability to attend religious services; (2) a part-time schedule; and (3) an option to apply for a shift on Walmart's full-time A-1 shift–Tuesdays through Fridays from 5:15 a.m. to 3:45 p.m.  (Def.'s SMF ¶¶ 27, 28, 31, 32).  Plaintiff initially insisted on a schedule that would allow him to continue to

work on Sundays and Mondays, earning the shift pay differential; take off every Saturday; and make up his missed Saturday hours by working hours on other shifts during the week.  (Def.'s SMF ¶¶ 29, 31-33).[11]  Because Walmart could not guarantee plaintiff that there would be a consistent need for coverage on other shifts to make up for his Saturday hours, Ms. Sheedy determined that providing plaintiff with the option to apply for a full-time shift during the week was the most effective way to accommodate his request not to work at all on Saturdays.  (Def.'s SMF, ¶ 32).

Plaintiff claims that Walmart was willing to be more flexible in granting religious accommodations to employees who were not Black Jews, but offers no factual support for this conclusory claim.  (Pl's Response to Def.'s SMF ¶ 27).  Accordingly, based on the authority cited above, the court will disregard this unsupported allegation as inadmissible in connection with this summary judgment motion.

It is somewhat unclear whether plaintiff concedes that Ms. Sheedy offered him all of the above-described scheduling options to address his religious request.  However, he asserts that none of them were "acceptable accommodations" because they would have involved a loss of weekly income and/or because requiring him to apply and compete for an open shift during the week was an option that was always

---

[11] Ms. Sheedy recalled that plaintiff initially insisted on replacing his Saturday hours with overtime work during other shifts, to avoid losing income.  Plaintiff denies that he insisted on earning overtime pay if he filled in on weekday shifts.  (Pl.'s Response to Def.'s SMF, ¶ 29).  However, he concedes that his renewed request for a scheduling accommodation in February 18, 2019 included the proposal that his pay rates not be altered if he changed shifts.  (Def.'s SMF ¶ 34; Pl.'s Response to Def.'s SMF ¶ 34 ("no dispute")).

available to any Walmart employee.  (Pl's Response to Def.'s SMF ¶¶ 28, 31-33).

Several times plaintiff claims that it was his right, when multiple options for

accommodations were considered, to have the benefit of the "least damaging option."

(Pl's Response to Def.'s SMF ¶¶ 28, 33).  However, "the Second Circuit has 'note[d]

that employees are not entitled to hold out for the most beneficial accommodation.'"

*Moore v. City of N.Y.*, 15-CV-6600, 2018 WL 3491286, at \*15 (S.D.N.Y. July 20,

2018), 2018 U.S. Dist. LEXIS 121769, at \*47, (citing *Baker v. The Home Depot*, 445

F.3d 541, 548 (2d Cir. 2006)), *report and recommendation adopted*, 2018 WL

4043145 (S.D.N.Y. Aug. 7, 2018)).

On or around February 18, 2019, plaintiff contacted Ms. Sheedy to renew his

request for a religious accommodation, proposing that, in order to make up for missing

hours on Saturday, he could:  (1) work extra time on other days; (2) exchange his

Saturday shifts with other employees; (3) work holidays; and (4) change shifts,

provided only that his pay rates (the weekend shift differential) would not be altered.

(Def.'s SMF ¶ 34).  On March 1, 2019, Ms. Sheedy emailed plaintiff to again offer

him the opportunity to apply for an opening in Defendant's A-1 shift, and this time,

plaintiff agreed to a transfer to the A-1 shift.  (Def.'s SMF ¶ 35).

The defendant argues that allowing plaintiff to change shifts to address his

religious needs did not constitute an adverse action, even if it resulted in the loss of

the premium pay he could have earned by continuing to work on the less desirable

weekend shift.  (Def.'s 11/4/2021 Mem. of Law at 5 (citing *Chavis v. Wal-Mart Stores

E., LP*, 265 F. Supp. 3d at 400 (holding:  "the fact that [the employee] needed to use

vacation days to avoid a religious conflict is not an adverse employment action because she was not deprived of a material benefit, [but] simply chose to use the benefit in a particular way.")).  However, even if the resulting loss of income did constitute an adverse action, requiring an employer to vary its work shift structure to accommodate a religious request not to work on a weekend day, **and** to somehow make up for the loss of premium pay that employee could earn for working on weekends, would be unreasonable.  *See Baker v. The Home Depot*, 445 F.3d at 548 (an accommodation is not unreasonable if it does not result in an **inexplicable or unjustified** diminution in his employee status or benefits).  While plaintiff continues to argue that the shift change was not an acceptable accommodation, it was, based on the undisputed facts, a reasonable accommodation as a matter of law.   As the court in *Chavis* reasoned in a similar context:

> Chavis's ability to use her vacation time to observe the Sabbath eliminated the conflict with the requirement that she work every third Sunday. Title VII requires only that Walmart offer a reasonable accommodation, not necessarily the one that Chavis seeks. . . .  By using her vacation days, Chavis was able to observe the Sabbath and was required only to use a workplace benefit for its intended purpose–time off from work. . . . Although "[o]rdinarily, questions of reasonableness are best left to the fact finder," . . . I find Walmart's interim accommodation reasonable as a matter of law.

*Chavis v. Wal-Mart Stores E., LP*, 265 F. Supp. 3d at 400.

## V.   Plaintiff's Hostile-Work-Environment Claim

Plaintiff's complaints suggest that he claims to be a victim of racial and religious discrimination by reason of a hostile work environment.  Defendant contends that plaintiff has not demonstrated that he was subject to severe or pervasive

workplace discrimination based on race or religion, and that Walmart appropriately addressed the single complaint that plaintiff made about an alleged "racist" remark about him.

### A.    Applicable Law

To establish a hostile work environment claim, a plaintiff must show "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004). "Isolated incidents usually will not suffice to establish a hostile work environment, although [this Court has] often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175-76 (2d Cir. 2012). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).

To analyze the first element of a hostile work environment claim, courts consider the "totality of the circumstances, in light of such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004). In addition, the plaintiff must show not only that the plaintiff subjectively perceived the environment to be abusive, but also that the environment

24

was objectively hostile and abusive.  *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015); *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004).  Finally, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic."  *See Tolbert*, 790 F.3d at 439; *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 655-56 (S.D.N.Y. 2017).

If a work environment can properly be considered "hostile" or "abusive" under this framework, "the discriminatory conduct of a plaintiff's co-worker, as opposed to a supervisor, may only be imputed to the employer if the employer 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'"  *Andrus v. Corning, Inc.*, No. 14-CV-6667, 2016 WL 5372467, at *4, 2016 U.S. Dist. LEXIS 131413, at *12 (W.D.N.Y. Sept. 26, 2016) (citing, *inter alia*, *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995)).  "To establish vicarious liability under Title VII, an employee is a 'supervisor' only if 'he or she is empowered by the employer to take tangible employment actions against the victim.'"  *Id.* (citing, *inter alia, Vance v. Ball State Univ.*, 570 U.S. 421, 428-29 (2013)).  "An employee is empowered to take "tangible employment actions" against the victim if the employee has the authority 'to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Id*.

## B.   Analysis

### 1.   The Alleged July 2018 "Act of Racism"

In the member-case Complaint, plaintiff alleges that, in **July of 2018**, he

reported "an act or racism" to management involving statements that co-worker, D.T., made in the presence of plaintiff's trainee, B.U.[12], but not in plaintiff's presence.  (Pl.'s Statement of Facts ("SOF"), ¶ 7, Dkt. No. 81-1 at 7).  Plaintiff provides dubious documentation of the incident, during which D.T. purportedly questioned another employee as to why plaintiff was allowed to serve as a T-3 trainer of new employees, why Walmart accepted plaintiff's forklift operator's license, and why he was even still employed by Walmart.  (Pl.'s 11/26/21 Reply at 3, Dkt. No. 86; Pl.'s Ex. 3, Dkt. No. 81-6; Pl.'s Ex. 2, Dkt. No. 81-5).  Plaintiff submitted what purports to be an apology from D.T. with respect to his statements in an e-mail with no legible date.  (Dkt. No. 81-6).[13]  However, plaintiff provides no evidence to support his apparent inference that the comments of his co-worker were motivated by or implicated plaintiff's race or religion, a pre-requisite for a hostile work environment claim.  (*See* Pl.'s 11/26/21 Reply at 3 ("plaintiff is not using documents [to] claim racism against defendants").

The defendant asserts that Walmart has no record of any complaint regarding D.T.'s alleged statements.  (Def.'s Response to Pl.'s SOF, ¶ 7, Dkt. No. 84 at 10).  The documentation presented by plaintiff that someone complained to management about the incident, consists of a vague, unsworn handwritten letter dated 12/10/2020 from B.U. (Dkt. No. 81-5), who states that she overheard what might be the same

---

[12] Both D.T. and B.U. were identified by name in some of the motion papers, but the court will continue to follow the practice reflected in most of the motions papers of not referring to non-management Walmart employees, other than plaintiff, by name.

[13] Defense counsel raised a valid objection to the admissibility of the poor copy of the undated e-mail, based on a lack of foundation and improper form.  (Dkt. No. 84-3, Objection No. 1).

conversation involving D.T.[14] after she started at Walmart "**on August 9, 2018**, and a self-serving handwritten note plaintiff created well after the fact (Dkt. No. 74-2).[15]

As the court discusses below, Walmart offers non-discriminatory reasons for why plaintiff was no longer allowed to serve as a T-3 trainer or as a back-up forklift operator later in 2018, decisions which plaintiff claims were made in retaliation for his report to management about D.T.'s statements.  In sum, plaintiff's unsupported allegations of this purported "act of racism" reported to management provide no evidentiary support for his claim of hostile-work-environment discrimination against his employer.

### 2.    The August 2019 "Angry Elf" Incident

In August 2019, plaintiff reported to Walmart management that he had been advised by a co-worker (R.B.), of statements made by another non-management employee (R.Q.) about plaintiff.  R.Q. reportedly asked R.B. if he knew plaintiff–described by R.Q. as a tall black employee with dreadlocks in the shipping department–after R.Q. had encountered plaintiff earlier in the day.  (Def.'s SMF, ¶ 50).  R.Q. related to R.B. that plaintiff had not responded when R.Q. tried to speak with

---

[14] B.U.'s letter states only that she overheard "a disturbing conversation involving two other co-workers in the 'Smoke Shack.'" (Dkt. No. 81-5).  Defense counsel raises a valid objection to this unsworn letter based on improper form and lack of foundation.  (Dkt. No. 84-3, Objection No. 2).

[15] Plaintiff submitted these undated notes in connection with a submission prior to the filing of the summary judgment motions.  Perhaps in light of plaintiff's discovery that B.U. did not start working at Walmart until August 9, 2018, he states that D.T.'s statement was made "in late July or early August," not in July of 2018, as stated in his complaint.  (Dkt. No. 74-2).  These notes provide no evidentiary corroboration for plaintiff's claims that he reported this alleged "act of racism" to Walmart management.

him, and described plaintiff as "one angry elf," which was a reference to the movie, *Elf*.  (Def.'s SMF, ¶ 53).  Plaintiff reported to management that R.Q. had referred to him as "an angry Black man" or "an angry Black elf," so H.R. Manager Sheedy conducted an investigation, consistent with Walmart's discrimination policies and practices.  (Def.'s SMF, ¶¶ 50, 51).

Ms. Sheedy interviewed R.Q. and Richard Zimmer, a Quality Assurance Manager who overheard R.Q.'s comments, and they both stated that R.Q. referred to plaintiff only as "one angry elf," not an "angry black elf" or an "angry black man." (Def.'s SMF, ¶¶ 53, 54).  After completing her investigation, Ms. Sheedy determined that any claim of racial discrimination was unsubstantiated, but spoke with R.Q. and cautioned him that his words could be misconstrued and could cause other employees concern.  (Def.'s SMF, ¶ 56).  Ms. Sheedy states that she provided plaintiff with feedback and advised him that his concerns had been addressed, and notes that there were no subsequent complaints involving R.Q.  (*Id*.)

Plaintiff concedes that he was not present when R.Q. made his comments and does not know precisely how R.Q. referred to him.  (Def.'s SMF, ¶ 55; Pl.'s Response to Def.'s SMF ¶ 55).  However, plaintiff contends that he "was referenced as Black, angry, tall, with dreadlocks, and Elf in one short conversation to . . . [R.B.] which is slanderous and defaming."  (*Id*.)  Plaintiff also criticized Ms. Sheedy's investigation, *e.g.*, because she did not interview R.B., even though he was readily available, and because she did not advise plaintiff of the results of her investigation.  (Pl.'s Response

28

to Def.'s SMF ¶ 56).[16]  He also claimed that he was mistreated when, after he made his

complaint against R.Q., he was told to finish his shift in the yard,[17] and was unfairly

disciplined for alleged attendance and timekeeping issues in the days after he made the

complaint.  (Pl.'s SOF, ¶ 9).

The court concludes that no reasonable fact finder, applying the objective test

described above, could conclude that the statements of R.Q. were sufficiently severe

or pervasive to support a hostile-work environment claims predicated on racial

discrimination.  First, plaintiff has offered no first-hand evidence that R.Q.'s

derogatory statements implicated plaintiff's race.  Plaintiff criticizes Ms. Sheedy for

interviewing R.Q. and Richard Zimmer, but not R.B., about the nature of R.Q.'s

comments.  However, plaintiff has not offered any affidavit or other statements from

his former colleague, R.B., to corroborate that R.Q.'s comments were racially

discriminatory.  All of the direct evidence of record indicates that the thrust of R.Q.'s

comments was that he thought plaintiff ignored him when R.Q. tried to speak with

---

[16] Plaintiff has objected to Exhibit 19 to the defense summary judgment motion (Dkt. No. 82-2 at 179-80)–typed notes which purportedly document Human Resource Manager Maureen Sheedy's investigation of plaintiff's complaint that R.Q. made racist remarks about him.  (Dkt. No. 85 at 4-5).  Plaintiff complains that the document is undated and the author is not identified, but Ms. Sheedy also submitted a sworn affidavit which recited the same facts.  (Def.'s Ex. 3, Dkt. No. 82-2 at 83-84).  Plaintiff also attacks the accuracy and credibility of Ms. Sheedy with respect to other matters, which does not, in the context of a summary judgment motion, warrant exclusion of the substance of her sworn affidavit regarding this incident.

[17] Plaintiff sometimes worked in the yard at the distribution center when he was filling in as yard driver, although he claims that there was no need for him as a yard driver on this day.  (Pl.'s Response to Def.'s SMF ¶ 17).  Plaintiff's assumption that completing his shift in the yard was racially motivated or punitive is not adequately supported and should not be considered in connection with a summary judgment motion.  In any event, this is not the type of "severe" treatment that supports a claims for a hostile work environment.

him, and that plaintiff appeared to be an angry person.  R.Q.'s references to plaintiff's race were made in the context of asking R.B. if he knew the person R.Q. was describing by his physical characteristics, because R.Q. was not familiar with plaintiff. Based on the legal standards set forth above, R.Q.'s characterization of plaintiff as angry was not "physically threatening or humiliating," but was, at most "a mere offensive utterance."

Even if R.Q.'s statements had a discriminatory racial element, they reflect a single incident, and were not sufficiently pervasive to support a hostile-work environment claim.  *See, e.g., Adeniji v. Admin. for Children Servs.*, 43 F. Supp. 2d 407, 423 (S.D.N.Y. 1999) (an employee's isolated comment to the plaintiff, a Muslim male from Nigeria, that he is not "a king in Africa" anymore, and that "[he is] subject to the rules of our office," was clearly insufficient to meet the "severe and pervasive conduct test" under Title VII); *Rogers v. Bank of New York Mellon*, No. 09 CIV. 8551, 2016 WL 4362204, at *17, 2016 U.S. Dist. LEXIS 107780, at 49-50 (S.D.N.Y. Aug. 15, 2016), *on reconsideration*, 2017 WL 4157376, 2017 U.S. Dist. LEXIS 152130 (S.D.N.Y. Sept. 19, 2017) (single comment that plaintiff was a "crazy black bitch," "although offensive, is at best a stray remark and is not sufficiently severe or pervasive to support a hostile environment claim.") (collecting cases); *Bennett v. New York City Dept. of Corrections*, 705 F. Supp. 979, 982 (S.D.N.Y. 1989) (no racially hostile environment where plaintiff only showed a few isolated instances of racial friction).

Even if R.Q.'s remarks were sufficiently severe to create a hostile work environment, no reasonable fact finder could conclude that Walmart failed to provide

a reasonable avenue for complaint or did nothing about the alleged harassment.
Plaintiff does not dispute that he was aware that Walmart had a structure for reporting,
investigating, and addressing claims of discrimination or harassment.  (Def.'s SMF ¶¶
5-10; Pl.'s Response to Def.'s SMF ¶¶ 1-12 ("No dispute")).  Although plaintiff
criticized H.R. Manager Sheedy and her investigation in various respects, he has
asserted no factual basis to dispute that Ms. Sheedy conducted an investigation of his
complaint, counseled R.Q. about his comments, and effectively prevented any
recurrence of any offensive remarks by R.Q.  *See, e.g., Murray v. New York Univ.
Coll. of Dentistry*, 57 F.3d 243, 250 (2d Cir. 1995) (management's admonishment to
an alleged harasser to stop was sufficiently calculated to end the harassment, in the
absence of notice that its admonition had not been heeded); *Miller v. New York State
Police*, No. 20-3976, 2022 WL 1133010, at *3 (2d Cir. Apr. 18, 2022) ("[t]he internal
procedures . . . seem to have promptly corrected the harassing behavior, as [plaintiff]
has not alleged any racially derogatory conduct . . . postdating [plaintiff's] filing of an
internal complaint.).  *See also Andrus v. Corning, Inc.*, 2016 WL 5372467, at *7
(plaintiff did not create a disputed issue of material fact by her conclusory speculation
pertaining to ineffective enforcement of her employer's code of conduct, the H.R.
investigator's alleged bias, and the alleged inadequacy of the investigation of alleged
harassment–matters of which plaintiff had no personal knowledge and for which she
provided no underlying facts).

### 3.    Other Alleged Acts of Harassment

It is difficult to discern from plaintiff's papers what other incidents he is relying

upon in connection with his hostile work environment claims, as opposed to his retaliation claims.  However, plaintiff may be claiming that a number of other alleged disciplinary and/or adverse actions by Walmart contributed to a racially or religiously hostile work environment.  The court concludes that many of these incidents do not support a hostile work environment claim.  In any event, considering the totality of all of the circumstances presented by plaintiff, no reasonable fact finder could conclude that he was the victim of a discriminatory, hostile work environment.

As the court will discuss below, many of the alleged incidents, *e.g.*, involving issues with plaintiff's attendance and timekeeping, did not actually result in discipline. The consequences of other disciplinary actions were mitigated or eliminated when plaintiff availed himself of Walmart's open door policy and complained to his general manager.  The court will also discuss, below, Walmart's professed non-discriminatory reasons for taking various actions against plaintiff, which plaintiff challenges with only conclusory allegations of racial motivation.  These various other actions and incidents do not support plaintiff's claim of a hostile work environment.  *See, e.g., Broughton v. Connecticut Student Loan Found.*, 64 F. Supp. 2d 64, 69 (D. Conn. 1999) (grievances relating to work privileges, performance evaluations, and manner of disciplinary notice, are insufficient as matter of law to establish a hostile work environment; plaintiff was never subjected to physically threatening or humiliating conduct, or racially derogatory or offensive comments or utterances); *Winkfield v. City of New York*, No. 97 CV 2183, 1999 WL 1191544, at *4 (S.D.N.Y. Dec. 15, 1999) (where plaintiff could point to only two incidents with racial overtones, he could not

sustain a claim for a hostile work environment based on other incidents, such as failure to grant him a promotion, or an allegedly false charge of being absent without leave based solely on conclusory claims that these actions were racially motivated); *Boyd v. Presbyterian Hosp. in City of New York,* 160 F. Supp. 2d 522, 532-33, 540 (S.D.N.Y. 2001) (no reasonable fact finder, applying an objective standard, would conclude that plaintiff was subjected to a racially hostile work environment based on the incidents upon which she relies–*e.g.*, allegedly unfair reports of incidents in her performance appraisals that were subsequently removed, and allegedly false allegations of misconduct that were retracted after plaintiff pursued a grievance); *Babcock v. Frank*, 783 F. Supp. 800, 808 (S.D.N.Y. 1992) (a defendant's letter of warning to an employee did support the claim of a severe or pervasive practice of harassment when the letter of warning was expunged from plaintiff's file shortly thereafter).

## VI.    <u>Plaintiff's Failure-to-Promote Claim</u>

Plaintiff alleges that Walmart prevented him from gaining access to apply for a management position, "withdrew" his application from consideration, and failed to promote him because of his race, color, or national origin.  Walmart contends that plaintiff was not qualified for the position he was able to apply for, and was not promoted for non-discriminatory reasons.

### A.    **Applicable Law**

To establish a prima facie case of discrimination with respect to a failure to promote claim, a plaintiff must provide sufficient evidence of the following: "(1) [he] belongs to a protected class; (2) [he] was qualified for the position for which [he]

applied; (3) despite [his] qualifications, [he] was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination [.]" *Marshall v. State of New York Div. of State Police*, 18 F. Supp. 2d 194, 198 (N.D.N.Y. 1998) (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir. 1995). "In determining whether an employee is 'qualified' under . . . the *McDonnell Douglas* analysis, a court must examine 'the criteria the employer has specified for the position.'" *Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 335 (S.D.N.Y. 2005) (citing, *inter alia*, *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997)). Absent a showing that the qualifications were developed in bad faith, "[a] plaintiff is not entitled to get his or her case before a jury by contending that the demands of the employer were not reasonably related to the performance of the job." *Alleyne v. Four Seasons Hotel-New York*, No. 99 CIV. 3432, 2001 WL 135770, at *10, 2001 U.S. Dist. LEXIS 1503 at *30 (S.D.N.Y. Feb. 15, 2001) (citing *Thornley*, 104 F.3d at 29), *aff'd*, 25 F. App'x 74 (2d Cir. 2002).

### B. Analysis

In April 2019, Walmart posted an opening for an Area Manager position at the distribution center where plaintiff worked, but H.R. Manager Sheedy learned that some employees, including plaintiff, were having difficulty completing the online application from their home computers. (Def.'s SMF ¶¶ 36-38). Ms. Sheedy arranged for plaintiff to get access to a Walmart computer, and he was able to complete and submit his online application within a day or two. (*Id.*, ¶¶ 39-40; Pl.'s Dep. at 129-30,

Dkt. No. 82-2 at 54-55).

For certain leadership positions, including the Area Manager job plaintiff applied for, Walmart requires all applicants to complete an online assessment examination, which was developed, administered, and scored by a third-party vendor. (Def.'s SMF, ¶¶ 41, 42).  Any individual who receives a failing ("red") score on the assessment examination is not advanced to the interview stage of the hiring process. (*Id.*, ¶¶ 45, 46).

During his deposition, plaintiff acknowledged that he completed the assessment from home the evening he completed the application.  (Pl.'s Dep. at 130).  Plaintiff alleges that he received confusing information about the status of his application, and did not receive notice of the results of his assessment examination directly from the third-party vendor.  However, he was ultimately advised that he had failed the assessment and, therefore, was not considered further for the Area Manager job. (Def.'s SMF, ¶¶ 45-47; Ex. 18, Dkt. No. 82-2 at 175-76 (internal Walmart e-mail reporting plaintiff's score on assessment); Pl.'s Response to Defendant's SMF ¶¶ 44-47 ).  As noted above, the Second Circuit has held that "being 'qualified' refers to the criteria the employer has specified for the position." *Thornley v. Penton Publ'g, Inc.*, 104 F.3d at 29.  Because plaintiff cannot show that he met defendant's criteria for the management position, he has failed to establish a prima facie case of discriminatory failure to promote. *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 127 (2d Cir. 2004).

Facing documentary evidence that he failed the assessment necessary to qualify

for consideration for the Area Manager position, plaintiff engages in speculation that the assessment is racially biased:

> Walmart's application process is run by a 3rd party that uses algorithms and different  methodologies to determine preferred candidates. These algorithms can easily have certain data entered that target and exclude individual or groups of individuals, for or against preference.  This can explain why DC6038 had no black managers and dominantly Caucasian management at time of Mr. Atkins employment.

(Pl.'s Response to Defendant's SMF ¶ 48).  Plaintiff's unsupported allegations that the assessment was biased are not properly admitted in connection with a summary judgment motion.  In any event, no reasonable fact finder would credit plaintiff's claims, given the information Walmart provided about its process for hiring managers, and conclude that its employment criteria were adopted or applied in bad faith :

> 43. . . . [The assessment examination] set out a standardized set of questions developed by the third-party vendor with the goal of identifying the most qualified candidate(s) for the position. . . . Notably, the examination did not ask any questions nor did it receive any information about an individual's protected characteristics, such as race. . . .
> 44. After an applicant completed and submitted his/her assessment examination, the third-party vendor's computerized system (not a Walmart manager or other Walmart associate)[18] scored the examination based on the answers selected by the applicant and generated the applicant's score for his/her "overall fit" for the position.
> 45. . . .  The score is shared with the appropriate managers responsible for hiring candidates.

(Def.'s SMF, ¶¶ 43-45; Ex. 3, Sheedy Affidavit, ¶¶ 23-27, Dkt. No. 82-2 at 81-82).

Plaintiff alleges that the person hired for the area manager position was "white, female, pregnant, and daughter of 20 plus year employee . . . who happens to also be a

---

[18] Walmart refers to its employees as "associates."

manager . . . .  At minimum there is on the face appearance of nepotism." (Pl.'s Response to Def.'s SMF ¶ 49).  The court notes that nepotism does not constitute illegal discrimination under Title VII or other employment laws.  Walmart advises that the person hired as the Area Manager, unlike plaintiff,  "did not score "red" on the assessment examination . . . and received a rating of 'strongly recommend' after both her first and second round of interviews." (Def.'s SMF, ¶ 49).  Based on the factual evidence of record, no reasonable fact finder could conclude that plaintiff met the qualifications set by Walmart for applicants to management positions, or that he was not considered for the Area Manager job based on discriminatory racial or religious considerations.  Hence, plaintiff's failure to promote claim should be dismissed on summary judgment.

## VII.   Plaintiff's ADA Claim

Plaintiff alleges that Walmart violated the ADA and the NYSHRL by terminating him on January 24, 2020, after "revoking" a prior medical exemption he had been granted not to wear a "StrongArm" device on the job.  Walmart contends that, after an earlier, "voluntary" pilot program testing the StrongArm device in 2018, from which plaintiff was exempted, it implemented a mandatory requirement in September 2019 that all employees in the shipping department wear the device, unless they followed an established process for receiving a medical accommodation.  Plaintiff insisted that Walmart honor his prior medical exemption, and, according to defendant, refused to participate in the "interactive" accommodation process, which provided the non-discriminatory basis for plaintiff's termination.

### A.    Applicable Law

To establish a prima facie case of discrimination based on an employer's failure to accommodate an employee's disability under the ADA or the NYSHRL, "an employee bears the burden of demonstrating that: (1) he was an 'individual who has a disability' within the meaning of the statute; (2) the employer had notice of his disability; (3) he could perform the essential functions of the job with reasonable accommodation; and (4) the employer refused to make such accommodation." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 & n.1 (2d Cir. 2000).

As Judge McAvoy of this district stated in *Boughton v. Town of Bethlehem*, No. 1:13-CV-01583, 2015 WL 5306077, at *9, 2015 U.S. Dist. LEXIS 120413, at *27 (N.D.N.Y. Sept. 10, 2015):

> "[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183-84 (2d Cir. 2006). . . .  Once the plaintiff establishes that he has requested an accommodation the employer has a duty "to investigate that request and determine its feasibility." *Parker*, 204 F.3d at 338 (2d Cir. 2000) . . . .  These responsibilities conform to the "interactive process" envisioned by the ADA, in which "employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan* [*v. N.Y. State Dep't of Labor*, 205 F.3d [562], . . .566 [(2d Cir. 2000)].  In evaluating a claim for failure to accommodate, therefore, "courts should attempt to isolate the cause of the breakdown [of the interactive process] and then assign responsibility." . . .

(some citations omitted).[19]  "An employee who is responsible for the breakdown of

---

[19] *See also Pimentel v. Citibank, N.A.*, 29 A.D.3d 141, 149, 811 N.Y.S.2d 381 (1st Dept. 2006) ("[D]isability discrimination statutes, whether federal or state, envisage employer and employee engaged in an interactive process in arriving at a reasonable accommodation for a disabled employee.").

that interactive process may not recover for a failure to accommodate." *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 946 (2d Cir. 2008).

### B.   Analysis

Between August and December of 2018, Walmart carried out a pilot program in the shipping department in the distribution center where plaintiff worked, to evaluate the effectiveness of the StrongArm device–"a lightweight device that associates wear to assess whether they are performing physical tasks in a safe manner . . . [which] is designed to reduce the likelihood of injury." (Def.'s SMF, ¶¶ 62-63). Plaintiff submitted a medical note to Manager Anne McRedmond stating "Please excuse [Ngcoba Atkins] from wearing of the Fuse sensor device, since he reports headaches with it[s] use," and plaintiff was exempted from wearing the StrongArm device at that time. (Def.'s SMF, ¶ 65 & Ex. 22, Dkt. No. 82-2 at 187-88; Pl.'s Response to Def.'s SMF, ¶ 65).[20]

In or about August 2019, employees, including plaintiff, were informed that, due to the success of the pilot program, use of the device would become mandatory in the shipping department beginning in September of that year. (Def.'s SMF, ¶ 67). Plaintiff and three other employees refused to wear the StrongArm device, citing medical reasons. (*Id.*, ¶ 68). Walmart's established accommodation policy for qualified associates with disabilities or medical conditions "sets out the steps an associate must take in order for their request for a reasonable accommodation to be

---

[20] The parties disagree as to whether participation in the StrongArm pilot program was "voluntary," and as to several other subsidiary issues which are not material to the resolution of the pending summary judgment motions.

evaluated, including the associate contacting Walmart's Accommodation Service Center ('ASC'), also referred to as 'Sedgwick', opening a claim and submitting the necessary supporting documentation so that Walmart can determine whether there is a reasonable accommodation that would be effective to meet the associate's needs." (*Id.*, ¶¶ 69-70).

Between August 2019 and January 2020, Walmart managers advised plaintiff and the other three employees who did not want to wear the StrongArm device, that use of the device was deemed essential to their jobs in the shipping department and, if they wanted a medical accommodation relating to the device, they would need to follow the formal process through Sedgwick. (Def.'s SMF, ¶¶ 71, 72). Plaintiff, contending that the "revocation of his [prior] accommodation" constituted retaliation for his filing of charges with the EEOC, protested by "refusing to wear the device absent proof that the exemption that they did provide me caused undue hardship to business." (Pl.'s Response to Def.'s SMF, ¶ 71).[21] Plaintiff contacted Sedgwick, noting that he hoped he would be able to use the medical documentation that he previously submitted, but he failed to open a claim to request an accommodation or to submit any required documentation, including his prior medical note. (Def.'s SMF, ¶¶ 73-78).

In early January 2020, two Walmart managers set up meetings with plaintiff and the three other employees who did not want to wear the StrongArm device for medical reasons, to advise them if they did not start wearing the device or did not successfully

---

[21] Plaintiff's retaliation claim relating to the StrongArm device is discussed below.

complete Walmart's formal accommodation process, they would be terminated for "failure to perform an essential function of their jobs."  (Def.'s SMF, ¶¶ 79-80).[22] Plaintiff secretly recorded the January 14, 2020 meeting with his managers, and both sides have offered transcripts of the conversation.  (Def.'s Ex. 29, Dkt. No. 82-2 at 212-220; Pl.'s Ex. 1, Dkt. No. 81-4).

Plaintiff disputes Walmart's position that the StrongArm device involved an essential function of his job of loading trailers, but offers no support beyond his conclusory opinion.  (Pl.'s Response to Def.'s SMF, ¶ 80).  However, as defense counsel notes in his November 17, 2021 brief (at 15, Dkt. No. 84-4 at 21), "a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position[,]" particularly when it involves issues of workplace safety.  *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998). *See also Douglas v. Long Island Jewish Med. Ctr.*, No. 08-CV-1370, 2010 WL 3187929, at *5, 6, 2010 U.S. Dist. LEXIS 77464, at *14, 17 (E.D.N.Y. July 29, 2010) ("In determining whether a function is essential, 'consideration shall be given to the employer's judgment as to what functions of a job are essential . . .'; a plaintiff who cannot perform the essential functions of a position 'cannot prove a prima facie case of disability pursuant to the ADA'") (collecting cases).

During the January 14th meeting, the managers explained to plaintiff that, unlike his request to opt out of the 2018 StrongArm pilot program, his request to

---

[22] The managers met with plaintiff on January 14, 2020, several days after they met with the other three employees, because plaintiff was on vacation at the time of the meeting with the other employees.  (Def.'s SMF, ¶ 81).

be excused from an essential function of his position required him to follow Walmart's formal procedure for seeking a medical accommodation. (Def.'s SMF, ¶ 82).[23] The managers stated that, while they had advised him, for several months, to complete the accommodation process by opening a claim with Sedgwick and submitting the necessary medical documentation, plaintiff still had not done so. (*Id.*)

Plaintiff refused to wear the "StrongArm" device and failed to comply with Walmart's accommodation process, insisting that his prior medical exemption be honored. (Def.'s SMF, ¶ 82; Dkt. No. 82-2 at 214, 216). Plaintiff states that, at the meeting, he "protest[ed] the illegal revocation of his approved accommodation and he reiterated he would not put his health or life in jeopardy by wearing this device which would be positioned on his only remaining kidney." (Pl.'s Response to Def.'s SMF, ¶ 82). While plaintiff produced some medical records relating to kidney issues in his response to defendant's summary judgment motion, (Dkt. No. 85-3), those records were never submitted to Sedgwick while plaintiff was still employed. Moreover, kidney issues were not raised when plaintiff submitted his medical note in connection with the StrongArm pilot program in 2018; the note referenced only that he claimed to suffer from headaches when wearing the device. (Dkt. No. 82-2 at 188).

---

[23] As defense counsel points out, plaintiff's "Fired Audio Transcript" of the January 14, 2020 meeting omits a crucial reference by his manager to the 2018 "pilot" program for the StrongArm device. This omission highlights plaintiff's unwillingness to distinguish between the pilot program that ended in December 2018 and the required program that began in September of 2019. (Def.'s Response to Pl.'s SOF at 9, n.4, Dkt. No. 84). The court reviewed the applicable recording and confirmed that defendant's transcript was accurate in this regard and that plaintiff's was not. (Compare Pl.'s Ex. 1, ¶ 8, Dkt. No. 84-1 at 1 with Def.'s Ex. 29, Dkt. No. 82-2 at 213).

During the January 14th meeting, plaintiff asked to be re-assigned as a full-time yard driver–a position did not require use of the StrongArm device–because he had experience as a backup yard driver.  The managers advised plaintiff, however, that because he was seeking such transfer as a reasonable accommodation for his claimed medical condition, he would still need to seek such an accommodation by opening a claim with Sedgwick and submitting the necessary medical documentation.  (Def.'s SMF, ¶ 83).

Plaintiff was also informed that, if he did not want to follow Walmart's accommodation procedure, another option for him would be to separately apply for an open position within the company that did not require use of the StrongArm device. (Def.'s SMF, ¶ 84).  However, as of that date, there was no opening for a full-time yard driver position–the specific job plaintiff requested.  (*Id.*)[24]  "[A]n employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal." *McElwee v. County of Orange*, 700 F.3d 635, 642 (2d Cir. 2012); *Miller v. New York State Police,* No. 20-3976, 2022 WL 1133010, at *4 (2d Cir. Apr. 18, 2022) (upholding grant of summary judgment on ADA claims where plaintiff, *inter alia*,

---

[24] Plaintiff claimed that the managers told him that he would need to go through the formal accommodation program even if he applied and competed for another available position; but, even his transcript of the meeting refutes that contention.  (Pl.'s Response to Def.'s SMF, ¶ 85; Pl.'s Ex. 1, Dkt. No. 81-4, ¶¶ 27, 29 ("MANAGER:  . . . You can apply for any open position and you can potentially get it depend[ing] on seniority and all that other stuff. You can always do that. . . .  Look that's separate from reasonable accommodation.")).  Given that plaintiff's claims in support of his summary judgment papers are directly contradicted by the evidence he presents, they should not be considered and do not create a material factual dispute.

failed to show that a light duty position she requested as an accommodation was available).

Plaintiff was also advised that he could still belatedly pursue the formal accommodation process, but he would need to wear the StrongArm device in the meantime because it was part of his job responsibility. (Dkt. No. 82-2 at 215-16). Ultimately, because plaintiff persisted in his refusal to wear the StrongArm device, he was terminated. (*Id*.)

Based on the admissible evidence in the record, no reasonable fact finder could conclude that plaintiff was not the party responsible for the breakdown in the interactive accommodation process in this case. While Walmart was willing to let plaintiff opt out of the StrongArm pilot project with a terse medical note that he complained of headaches, it was not unreasonable for the company to require compliance with the formal accommodation process once they determined that the StrongArm was a valuable worker safety device deemed essential for loaders in the shipping department. Plaintiff's refusal, for almost six months, to follow through with Sedgwick, and his last minute insistence on a transfer to another position for which there were no openings was clearly not a reasonable request for an accommodation.

The fact that Walmart imposed the same requirements on the three other employees who resisted wearing the StrongArm device refutes plaintiff's claim that he was justified in protesting Walmart's insistence that he pursue the formal accommodation process, based on his view that the company was retaliating against him for an unrelated EEOC complaint. Moreover, there is scant evidence that plaintiff

timely advised Walmart of a qualifying disability that supported his claim for an accommodation. And, even if Walmart was given timely notice of a qualified disability, plaintiff's sabotage of the interactive accommodation process required by applicable state and federal statutes requires dismissal of his claim for disability discrimination. *See, e.g., Economou v. Caldera*, No. 99 CIV. 12117, 2000 WL 1844773, at *23-24, 2000 U.S. Dist. LEXIS 18231, at *77-84 (S.D.N.Y. Dec. 18, 2000) (because plaintiff was responsible for a breakdown in the interactive process, by refusing to submit further information supporting his requested accommodation beyond cursory medical notes, the defendant is granted summary judgment on the reasonable accommodation claim).

## VIII. **Plaintiff's Retaliation Claims**

Plaintiff contends that, following his pursuit of various "protected activities," Walmart repeatedly pursued "adverse actions" against him, including his ultimate termination from employment. Defendant argues that plaintiff has not offered sufficient admissible evidence to persuade a rational fact finder that there was an adequate causal connection between plaintiff's alleged "protected activities" and the purported "adverse actions" taken against him.

### A. **Applicable Law**

The *McDonnell-Douglas* burden shifting analysis, discussed above, applies to claims of retaliation under Title VII, the ADA, and the NYSHRL. *Lin v. New York State Dep't of Lab.*, No. 1:14-CV-771 (LEK/DJS), 2017 WL 435811, at *4, 2017 U.S. Dist. LEXIS 13682 at *13-14 (N.D.N.Y. Feb. 1, 2017) (Title VII), *aff'd*, 720 F. App'x

89 (2d Cir. 2018); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir.

2006) (NYSHRL); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)

(ADA).  As stated by the District Court in *Lin*:

> To state a prima facie case of retaliation . . ., a plaintiff must show that: (1) []he
> was engaged in protected activity; (2) the employer was aware of that activity;
> (3) []he was thereafter subjected to an adverse employment action; and (4) there
> was a causal connection between [his] protected activity and the adverse action.
> . . . Once a plaintiff establishes a prima facie case, "the burden shifts to the
> employer to articulate 'some legitimate, nondiscriminatory reason' for its
> action." . . . "Finally, if the defendant carries his burden[,] 'the presumption of
> retaliation dissipates' and the plaintiff must demonstrate that the legitimate
> reason offered is mere pretext for retaliation."

2017 WL 435811, at *4 (citations omitted).

"Protected activity" "includes both 'opposing discrimination proscribed by the

statute and . . . participating in Title VII proceedings.'" *Jaeger v. N. Babylon Union

Free Sch. Dist.*, 191 F. Supp. 3d 215, 231-32 (E.D.N.Y. 2016) ("Retaliation occurs

when an employer takes action against an employee . . . because he engaged in

protected activity–complaining about or otherwise opposing discrimination") (citing,

*inter alia*, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015).

"[I]n order to be considered a protected activity, a Title VII plaintiff must have had a

good faith belief that the challenged conduct on the part of his employer was

prohibited by the statute, even if, in actuality, it was not." *Jaeger*, 191 F. Supp. 3d at

232-33 (citing, *inter alia*, *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206,

212 (2d Cir. 2010)).

"[U]nlike the discrimination provision of Title VII, which applies only to

adverse actions affecting the terms and conditions of employment, the retaliation provision applies to actions 'likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.'" *Vaughn City of New York, No*. 06-CV-6547, 2010 WL 2076926, at *14 (E.D.N.Y. May 24, 2010) (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, (2006)). "The 'plaintiff must show that a reasonable employee would have found the challenged action materially adverse,' which means that the adverse action was not trivial and would deter a reasonable person from engaging in protected activity." *Jaeger*, 191 F. Supp. at 235 (citing, inter alia, *Burlington*, 548 U.S. at 67). "Title VII is not a general 'bad acts' statute," and "'petty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation." *Id*. (citations omitted).[25]

"'[R]etaliation claims must be proved according to traditional principles of but-for causation.' *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, . . . (2013). Since but-for causation is now required, '[i]t is not enough that retaliation was a substantial or motivating factor in the employer's decision. . . .'" *Hua Lin v. New York State Dep't of Lab*., 720 F. App'x 89, 90 (2d Cir. 2018) (citing *Vega v. Hempstead Union Free Sch. Dist*., 801 F.3d at 90-91)). "While the temporal proximity of [protected conduct and adverse actions] gives rise to an inference of retaliation for

---

[25] The court understands that "in determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *Simpson v. New York State Dep't of Civ. Servs.*, 166 F. App'x 499, 502 (2d Cir. 2006) (citation omitted).  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

**B.   Analysis**

In support of his retaliation claims, plaintiff appears to claim that he engaged in the following "protected activity": (1) reporting an alleged "act of racism" to management in July 2018, relating to comments his co-worker, D.T., made in the presence of plaintiff's trainee, B.U.; (2) requesting a scheduling accommodation based on his religion, in October 2018, and then again in February 2019; (3) complaining to management about the allegedly racist remarks made by R.Q. about plaintiff in the presence of others on August 1, 2019; (4) filing his initial racial/religious charges with the EEOC on October 23, 2019; and (5) requesting that the EEOC return his discrimination charges to investigation after defendant delayed a possible mediation process on January 6, 2020.

The plaintiff appears to assert that the following alleged "adverse" actions were caused by one or more of his alleged protected activities: (1) terminating plaintiff as a "T-3" trainer; (2) no longer giving plaintiff assignments to operate a forklift; (3)

singling plaintiff out for discipline with respect to an incident in which freight was damaged on November 12, 2018; (4) overlooking plaintiff for cross training in February 2019; (5) denying plaintiff the opportunity to apply for a supervisory position in April 2019; (6) making plaintiff finish his shift in the "yard" at his distribution center after he complained of the remarks by R.Q. on August 1, 2019; (7) allegedly unwarranted disciplinary write-ups for time and attendance lapses in August 2019; (8) "revocation" of his "medical exemption" from the requirement to wear the StrongArm device; and (9) plaintiff's termination from employment on January 14, 2020.  Because plaintiff focuses on the temporal proximity of some of his "protected activities" and the alleged "adverse actions" directed at him, the court will organize the analysis of plaintiff's retaliation claims chronologically.

Although the defendant focuses on plaintiff's failure to establish that retaliation for plaintiff's alleged protected activity was the but-for cause of the "adverse employment actions" that he was subjected to, some of the purported protected activity and employment actions do not meet the criteria necessary to support a retaliation claim.  It is also worth noting that, while the legal definition of adverse action is an objective one,[26] the admissible evidence in this case makes clear that no actions directed at plaintiff during his employment at Walmart deterred him from exercising his right to complain about any perceived incident of mistreatment on the job.  *See,*

---

[26] *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 228 (E.D.N.Y. 2014) (the Second Circuit emphasizes that the inquiry into the materiality of a retaliatory action should focus on its objective likelihood of dissuading reasonable employees from challenging discrimination in the workplace).

*e.g., Matthews v. Corning Inc.*, 77 F. Supp. 3d 275, 298 (W.D.N.Y. 2014) (observing that plaintiff's own conduct demonstrates that any reaction by defendants to her complaints of discrimination did not dissuade her from continuing to make complaints).

### 1.    Plaintiff's Request for a Religious Accommodation and Subsequent "Adverse Employment Actions"

As discussed above (in section V.B.1.), plaintiff has offered only conclusory and contradictory statements regarding his claim that he reported "an act of racism" to Walmart management involving the statements of D.T. in or around July 2018.[27] Moreover because nothing in plaintiff's description of D.T.'s statement suggests that they implicated plaintiff's race or religion, it is clear that, even if he reported the incident to management, plaintiff lacked a good faith belief that those statements involved prohibited discrimination.  Hence, no reasonable fact finder could conclude that plaintiff engaged in "protected activity," in connection with D.T.'s alleged statements, that would support a retaliation claim.

Thus, the earliest incident of protected activity of plaintiff occurred in **October 2018**, when he requested a scheduling accommodation based on religious grounds.  He alleges, in conclusory fashion in the complaint, that he "disputed" Walmart's response to his request in November 2018.  Plaintiff renewed his request for a scheduling accommodation on February 19, 2019.

---

[27] As noted above, most of the purported documentation submitted by plaintiff regarding this incident is not properly admissible in the context of summary judgment motions.

Plaintiff claims that he was terminated as a trainer by Walmart in retaliation for his report of discriminatory conduct by other employees.  At some point after he was hired, plaintiff was appointed at a T-3 Trainer in the Shipping Department, which involved training new employees on an as-needed basis for no additional compensation.  (Def.'s SMF, ¶ 19-21).  In the fall of 2018, Walmart replaced the T-3 Trainer program with a new Certified Training Associate ("CTA") pilot program, which added new eligibility requirements, excluding any employee with a "Step 1" level of discipline in the category of safety or a "Step 2" level of discipline in any other category.  (*Id.*, ¶¶ 22-23).  In preparing to implement this program, **on August 27, 2018**, the responsible manager identified five employees who served as T-3 Trainers who would be disqualified from participating in the new training program, including plaintiff, who had Step 1 discipline imposed on June 30, 2018 after he committed a safety violation.  (*Id.*, ¶¶ 24-25; Def.'s Exs. 11 & 12, Dkt. No. 82-2 at 148-53).  Thus, the plan to remove plaintiff, as well as four other similarly situated employees, from the training program was in motion in August 2018, before plaintiff engaged in any "protected activity."  As a result, it is clear that plaintiff's elimination as a trainer was not caused by any protected activity and would not support a retaliation claim, even if the loss of the unpaid training position could be considered an "adverse action."  *See Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 775-76 (E.D.N.Y. 2018) (when the employer took steps to investigate allegations regarding an employee prior to any knowledge of the employee's EEOC Charge, the fact that the resulting adverse action was implemented after the employer learned of

the EEOC Charge does not establish as causal connection) (citing, *inter alia, Slattery*
*v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).  Even if the plan to
remove plaintiff as a trainer had come after he engaged in some protected activity, the
fact that four other similarly situated employees were also terminated as trainers
establishes that plaintiff cannot establish that Walmart's non-retaliatory reason for its
action was pretextual.[28]

Plaintiff also asserts that he was no longer given forklift assignments at the
distribution center in retaliation for his "protected activity."  When plaintiff began
working at Walmart, he held a valid forklift certification from prior employment and
was periodically given forklift assignments in the distribution center.  After plaintiff's

---

[28] In his 11/26/2021 brief, plaintiff makes an unsupported claim that General Manager
Larry Raike agreed to remove the Step 1 safety violation from plaintiff's record during an "open
door" session in June or July 2018, before it was determined, in late August, that plaintiff would
be disqualified from the new training program because of that violation.  (Dkt. No. 85 at 8-9).
Plaintiff's disciplinary record, however, indicates that this safety violation was not cancelled until
September 15, 2018.  (Def.'s Ex. 12, Dkt. No. 82-2 at 153).  Plaintiff claims that General
Manager Raike was "negligent" in not promptly removing the Step 1 safety violation from
plaintiff's record.  (Dkt. No. 85 at 9).  However, the only documentation plaintiff offers that Mr.
Raike agreed to cancel plaintiff's safety violation in June or July of 2018 was a tape recording
(labeled "Larry Meeting") of an undated conversation in which Mr. Raike says that he
remembered the safety step violation and "took care of it."  (*Id.*)  The court listened to relevant
portions of the Larry Meeting recording, even though the defense properly objected to the exhibit
because it was not produced in discovery.  (See Dkt. No. 90-1, Objection No. 2).  It is clear that
the "Larry Meeting" occurred long after the summer of 2018, because in the early portion of the
conversation, plaintiff complains about the time and attendance points he received after reporting
the statements of R.Q. in August, 2019.  (See Partial Tr. of "Larry Meeting," Dkt. No. 86-2).
Thus, this recorded conversation provides no support for plaintiff's claim that Mr. Raite
cancelled the Step 1 violation in June or July, as opposed to in September of 2018.  In any event,
even if Walmart management had been "negligent" in keeping plaintiff's disciplinary records
current, that does not provide any evidence establishing that Walmart's stated reason for
removing plaintiff from the training program was retaliatory or pretextual.  *See, e.g.,*
*Bowen-Hooks v. City of New York*, 13 F. Supp. 3d at 232 (whether defendants' employment
actions "were unreasonable, unfair or even untrue, . . . without any showing of retaliatory motive,
they do not support [p]laintiff's retaliation claim) (collecting cases).

forklift certification expired in 2018, he was not given any further forklift
assignments.  (Def.'s SMF, ¶ 13; Pl.'s Response to Def.'s SMF, ¶ 13).  Plaintiff stated
that "Walmart requires Walmart issued certification and testing to get certified to use
power equipment at Walmart facilities."  (Response to Def.'s SMF, ¶ 13).  Plaintiff
implicitly acknowledges that Walmart nonetheless allowed him to operate a forklift
based on an outside certification, but complains that Walmart discriminated and
retaliated against him when, presumably, they required that he get internally certified
through Walmart to operate a forklift once his outside certification expired.[29]  (*Id.*)
This argument highlights plaintiff's tendency to claim discrimination and bias every
time he was required to comply with a company policy or procedure that he did not
like, and, indicates that when his employer "gave him an inch" of flexibility with
respect to employment requirements, plaintiff thereafter often insisted on "taking a
mile."  No reasonable fact finder could determine that Walmart's stated reason for
stopping plaintiff's forklift assignment after his certification expired was retaliatory or
pretextual.

On November 12, 2018, plaintiff was cited for an "occurrence"–a routine form
of discipline at Walmart less severe than a "Step"–for failing to follow general safe
work practices, resulting in damage to an oil bucket.  (Affidavit of Operations
Manager James Pardee, ¶¶ 2-3, Dkt. No. 84-1).  Plaintiff alleges that he was the only

---

[29] There is nothing in the record to suggest that plaintiff ever asked to participate in the
necessary training at Walmart to become certified to operate a forklift, or that he was ever denied
such an opportunity.  (Def.'s SMF, ¶ 13).

member of his loading crew singled out for discipline for this incident,[30] in retaliation for his prior protected activity.  In notes made well after the incident, plaintiff writes that he was advised by a Walmart manager that plaintiff was held accountable because he was the individual on the loading crew who was "actually controlling equipment" that caused the damage–a fact which plaintiff does not appear to contest.  (Dkt. No. 74-2 at 1, 3).  Because of the minor nature of the discipline, it expired on plaintiff's employment record on May 11, 2019.  (Pardee Aff., ¶¶ 5, 10).  Operations Manager Pardee states that he had no retaliatory motivation with respect to this, or any other decisions he made with respect to plaintiff.  (*Id*., ¶ 11).  Plaintiff's failure to document any "weaknesses, implausibilities, inconsistencies, or contradictions" in the Walmart's proffered legitimate, nonretaliatory reasons for this action is insufficient to create a material issue of fact regarding whether those reasons were pretexual, notwithstanding the temporal proximity between this discipline and plaintiff's unrelated efforts to change his schedule.  *See, e.g., Bowen-Hooks v. City of New York,* 13 F. Supp. 3d at 233.  Although plaintiff may have thought it was "unfair" that he was disciplined because he was the operator of the equipment that caused the freight damage, "[w]ithout any other admissible evidence in the record, there is nothing to suggest that retaliation was the but-for cause" of the discipline imposed.  *Id*. at 232, 233.

---

[30] Mr. Pardee's affidavit stated that he did not recall if other employees were disciplined in connection with the incident, but noted that plaintiff would not have been privy to whether discipline was imposed on others.  (Pardee Aff. ¶ 6).  "Plaintiff's allegations are largely conclusory and based on Plaintiff's testimony alone, but Plaintiff has not established that []he has any personal knowledge of the discipline that was or was not received by other" similarly situated individuals. *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d at 233.

Plaintiff further alleges, in conclusory fashion, that he was denied cross-training opportunities in retaliation for his prior protected activity.  Plaintiff's complaint alleges that he was overlooked for a cross-training position by Manager David White in February 2019, but provides no further details about the nature of the training, or why plaintiff should have been selected over other employees at his large distribution center.  During his deposition, plaintiff stated that he was overlooked for some cross-training in favor of others who had less seniority, but acknowledges that he was provided other cross-training opportunities.  (Pl.'s Dep. at 187, 206, Dkt. No. 82-2 at 68, 73).   Again, plaintiff offers nothing but conclusory allegations to support his claim that the fact that he did not get every cross-training opportunity he wanted–assuming that could be considered an adverse action–was the result of retaliation for his unrelated requests to obtain a schedule change at around the same time.

Plaintiff also claims that, in April 2019, he was denied the right to apply for a supervisory position at his distribution center, again in retaliation for his prior protected activity.  As discussed above (in Section VI.B.), although plaintiff and other employees encountered technical difficulties in submitting online applications for an Area Manager position in April 2019, plaintiff was ultimately able to submit an application and to complete the required assessment examination.  While plaintiff claims he was not initially advised of the status of his application, he was ultimately told that he was not considered for an interview because he failed the assessment examination, which was a prerequisite for further consideration.  While Walmart could have been more transparent with respect to the status of plaintiff's application for the

management position, no reasonable fact finder could conclude that plaintiff was denied the right to apply or that some retaliatory motive was the but-for cause of how his application was handled.[31]

### 2. Plaintiff's Complaint of Alleged Racial Discrimination and Subsequent "Adverse Employment Actions"

Plaintiff next engaged in arguable "protected activity" when he complained to Walmart management about the "angry elf" comments that R.Q. made about plaintiff in early August 2019.  He claims that, in retaliation for this protected activity, he was required to finish his shift in the distribution center "yard" on the day he made the complaint and was unfairly disciplined for alleged time and attendance infractions on three subsequent occasions in August.  Plaintiff does not explain who directed him to finish his shift in the yard or why.  However, he suggests that he was punished for making the complaint of racial discrimination while claiming, with no apparent evidentiary support, that R.Q., a Caucasian quality assurance worker, was allowed to complete his shift doing his normal work.[32]  Plaintiff sometimes worked in the yard at the distribution center when he was filling in as yard driver, although he claims that there was no need for him as a yard driver on this day.  (Pl.'s Response to Def.'s SMF ¶ 17).  Nonetheless, being required to finish his shift in the yard is not the type of "adverse action" that would deter a reasonable employee from exercising his right to complain about unlawful discrimination.  *See, e.g., Matthews v. Corning Inc.*, 77 F.

---

[31] It should be noted that, by April 2019, plaintiff had accepted a schedule change and was no longer discussing his request for a religious accommodation with Walmart's H.R. Manager.

[32] The facts relating to these events are described in Section V.B.2. above.

Supp. 3d at 296, 297-98 (plaintiff's lateral transfer to what she viewed as a less desirable project and various rude slights that she experienced do not rise to the level of an adverse employment action in the retaliation context) (citing *inter alia*, *Rivera v. Orange Cnty.*, No. 10 CV 9134, 2013 WL 812016, at *9 (S.D.N.Y. Mar. 5, 2013) (defendants' alleged acts of excluding plaintiff from meetings and generally making him feel isolated at work do not qualify as an "adverse employment action," but rather were among those petty slights or minor annoyances that often take place at work and that all employees experience.)).  Moreover, plaintiff's apparent assumption that retaliation was the but-for cause for requiring him to complete his shift in the yard is not adequately supported and should not be considered in connection with a summary judgment motion.

With respect to the first two instances in which plaintiff claims he was wrongly "disciplined" for time and attendance issues, it is clear that, while plaintiff's supervisors may have discussed these issues with plaintiff, they never pursued disciplinary action against him.  During his deposition, plaintiff acknowledged that, after plaintiff complained, via the "open door" process, to General Manager Larry Raike about being disciplined for the time and attendance issues, it was established the plaintiff was never written up for not "punching out" on the time clock when he took personal leave and left early after taking lunch on the day after his complaint about R.Q.'s statements.  (Pl.'s Dep. at 115, Dkt. No. 82-2 at 50; Def.'s Ex. 21, Dkt. No. 82-2 at 184 (showing no disciplinary "points" on 8/2/2019 and 8/7/2019 for "EARLY OUT").  The fact that plaintiff's supervisor raised these time and attendance issues

with plaintiff, but did not discipline him, does not rise to the level of an adverse

employment action supporting a retaliation claim. *See, e.g., Jaeger v. N. Babylon*

*Union Free Sch. Dist.*, 191 F. Supp. 3d at 235-36 (plaintiff teacher's complaint that a

school district official accused him of improperly leaving school during a "conference

day," but did not impose any discipline when the teacher explained he wasn't aware of

the applicable school policy, "is a classic[] example of a de minimis workplace

grievance that cannot rise to the level of an actionable adverse employment action" in

the context of a retaliation claim).

Plaintiff did originally receive three disciplinary points on August 11, 2019

when he failed to report for a mandated shift and did not notify Walmart according to

established procedures.  (Affidavit of Larry Raike, ¶¶ 2-7, Dkt. No. 84-2).  Plaintiff

claims that he orally advised his supervisors twice that he would not come in for that

mandatory shift, and complained about the points he received during the "open door"

meeting with General Manager Raike.  (Pl.'s Dep. at 114-15, Dkt. No. 82-2 at 49-50).

Although Mr. Raike concluded that plaintiff failed to follow the proper procedure to

advise that he would not report for the shift, Mr. Raike reduced the number of points

to one (because attendance at the shift was mandatory), which ensured that plaintiff

would not be deprived of a quarterly incentive bonus.  (Raike Aff., ¶¶ 8-15; Def.'s Ex.

21 (showing one point charged for absence on 8/11/2019); Pl.'s Response to Def.'s

SMF, ¶ 59 ("One point remained because Mr. Atkins did miss (no show) a mandated

day").  During the open door meeting, Mr. Raike explained to plaintiff that the system

for recording points for attendance violations was automated and operated beyond the

control of line supervisors unless an employee raised an issue, e.g., through the "open door" process.  (See Partial Tr. of "Larry Meeting," Dkt. No. 86-2 at 4-7).  Mr. Raike avers that none of the actions or decisions he was involved with regarding plaintiff were based on any discriminatory or retaliatory motivation and the plaintiff tacitly acknowledged that his General Manager addressed most of his concerns.  (Raike Aff., ¶ 16; Pl.'s Response to Def.'s SMF, ¶ 59) ("Mr. Atkins believes adverse actions would have continued had he not voiced his concerns with Larry")).

Under all these circumstances, no reasonable fact finder could determine that any retaliatory motive relating to plaintiff's complaints about R.Q.'s statements was the but-for cause of Walmart's handling of plaintiff's time and attendance issues over the following ten days.  Plaintiff acknowledged that he may not have followed all of the required time and attendance policies and procedures (Partial Tr. of "Larry Meeting," Dkt. No. 86-2 at 3-5); but, in light of management's sympathetic response to his excuses, plaintiff suffered no objectively material adverse impact with respect to his employment or compensation.[33]

### 3.    Plaintiff's EEOC Complaint and his Subsequent Termination, Related to the StrongArm Device

Plaintiff's filing of a discrimination complaint with the EEOC on October 23,

---

[33] Plaintiff alleges, without any documentary support, that, after two points were removed from his record relating to his August 11, 2019 attendance issue, they were added back on Walmart's automated system.  After he complained, the points were removed again and plaintiff did not miss out on his quarterly incentive bonus.  (Pl.'s Response to Def.'s SMF, ¶ 61.)  Plaintiff's unsupported speculation that this reflected further retaliation for his complaint about R.Q.'s statements is not admissible and is insufficient to create a material issue of fact supporting his retaliation claim.  (See Def.'s Objections to Pl.'s Response to Def.'s SMF, Objection No. 32, Dkt. No. 90-1 at 18-19).

2019 clearly constitutes "protected activity." (Def.'s Ex. 33, Dkt. No. 82-2 at 230-32).[34] Plaintiff also asserts that, on January 6, 2020, he requested that the EEOC return his discrimination charges to "investigation" status after defendant delayed a possible mediation process, and apparently views this as further "protected activity." Plaintiff previously filed a letter to him from the EEOC dated January 7, 2020, which stated that his complaint "is no longer being considered for mediation through the [EEOC's] Mediation Program as one of the parties declined or failed to respond to the EEOC's offer to mediate . . . ." (Dkt. No. 53-1). Walmart thereafter submitted substantive responses to plaintiff's charges before the EEOC on January 27th and June 20th. (Pl.'s Ex. 4, Dkt. No. 81-7; Pl.'s Ex. 5, Dkt. No. 81-8). It is not clear that plaintiff did anything to bring about the change in status of the EEOC proceedings on January 7, 2020, or that the change had any particular significance to plaintiff's retaliation claim. In any event, plaintiff's ongoing participation in the EEOC proceedings during this period would properly be considered as "protected activity."

Plaintiff alleges that Walmart's "revocation" of his "medical exemption" relating to the StrongArm device and his ultimate termination on January 14, 2020 for refusing to wear the StrongArm device were actions taken by Walmart in retaliation for plaintiff's pursuit of the EEOC claim and other protected activity. In Section VII.B. above, the court discusses, at length, why Walmart insisted that plaintiff to go

---

[34] Plaintiff's lead-case Complaint claims that he filed EEOC charges in July of 2019, but then concedes that he did not sign an "official EEOC charge" until October. Whatever communication with the EEOC that plaintiff may have had before he filed his formal charge, the court found nothing in the record to indicate that Walmart management was aware of it.

through its formal accommodation process if he wanted an exemption from wearing the StrongArm device after it became a formal job safety requirement for loaders in the Shipping Department.  The discussion above also describes Walmart's stated non-discriminatory reasons for terminating plaintiff, after he failed to pursue the formal accommodation process for almost six months, and continued to refuse to wear the StrongArm safety device.

Plaintiff's conclusion that Walmart's employment actions against him relating to the StrongArm device constituted retaliation for his EEOC complaint has no significant evidentiary support beyond the temporal proximity of the filing and pendency of the EEOC action and his termination.[35]  As noted above, Second Circuit authority makes clear that temporal proximity alone is not sufficient to establish that a non-retaliatory reason for an employment action is pretextual.  *See, e.g.,* *Bentley-Ammonds v. Northwell Health, Inc.*, No. 21-835-CV, 2022 WL 893716, at *2-3, 4 (2d Cir. Mar. 28, 2022) (notwithstanding plaintiff's emphasis on the "temporal proximity" between her alleged engagement in protected activities and her termination, her retaliation claim is subject to dismissal on summary judgment because "she fail[ed] to convincingly establish that [her employer's] rationales for her

_____

[35] As noted above, plaintiff's supervisors started advising him that he would be required to wear the StrongArm device unless he obtained an accommodation through the formal process in place at Walmart starting in August 2019, well before he filed his EEOC complaint.  As suggested by *Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d at 775-76, cited above, the fact that, before plaintiff filed his EEOC complaint, Walmart was advising plaintiff of the consequences of failing to comply with the job requirement involving the StrongArm device unless he obtained a formal accommodation, diminishes the probative value of temporal proximity as proof of but-for causation.

termination are merely pretextual."); *Blackwell v. City of Bridgeport*, 238 F. Supp. 3d 296, 312-14 (D. Conn. 2017) ("Plaintiff's evidence of temporal proximity to adverse actions is insufficient [to avoid summary judgment], particularly in the absence of any other evidence from which a jury could find that the legitimate non-discriminatory reasons proffered for Defendant's actions were mere pretext and that the adverse employment actions were motivated even in part by retaliatory animus").[36]  The fact that Walmart consistently imposed the same requirements on the other employees in the Shipping Department who did not want to wear the StrongArm devise further establishes that neither plaintiff's EEOC filing, nor his other protected activities, were a but-for cause of Walmart's employment actions against plaintiff, including his ultimate termination.[37]

The court concludes that no rational fact finder could conclude that plaintiff's participation in protected activities was the but-for cause of any adverse actions taken by Walmart against the plaintiff, or that defendant's non-discriminatory reasons for the relevant employment actions were pretextual.  Accordingly, plaintiff's retaliation

_____

[36] *See also Montanez v. McDean LLC*, No. 1:16-CV-447, 2018 WL 1183688, at *8 (N.D.N.Y. Mar. 6, 2018) ("plaintiff's term of employment reflects a compressed timeline of events where workplace policy violations, instances of progressive discipline, and examples of formal and informal protected activity are all bound up together.  In the absence of some manner of additional evidence to suggest possible retaliatory animus, temporality itself cannot stand alone as evidence of causality."), *aff'd*, 770 F. App'x 592 (2d Cir. 2019)).

[37] Plaintiff alleges that Walmart's retaliation continued after his termination when they delayed his receipt of unemployment benefits.  However, H.R. Manager Sheedy  alleged that, consistent with her normal practice, she provided accurate information to the New York Department of Labor when it requested information about plaintiff's separation from Walmart. (Sheedy Aff., ¶ 58).  Ms Sheedy also referenced supporting documentation that confirmed that Walmart did not contest plaintiff's claim for unemployment.  (*Id.*; Def.'s Ex. 32, Dkt. No. 82-2 at 228-29).

claims, whether under Title VII, the ADA, or the NYSHRL, will be dismissed.

## IX.   **Plaintiff's Remaining Claims**

For all the foregoing reasons, plaintiff's employment discrimination claims, whether under Title VII, the NYSHRL, or the ADA–for failing to grant a religious accommodation, hostile work environment, failure to promote, disability discrimination, and retaliation–are not legally supported and are all subject to dismissal.  Plaintiff's complaints provide no basis for his claim that the defendants violated his rights under a "laundry list" of other statutes or causes of action–Title I (addressing "Voting Rights"); Title V ("Establishment of Commission on Civil Rights"); NYLL § 203-e ("Prohibition of Discrimination Based on an Employee's or a Dependent's Reproductive Health Decision Making"); NYLL § 239 ("Provisions in [Building Service Work] Contracts Prohibiting Discrimination . . ."); NY HRL Bill-07797 (prohibiting race discrimination based on natural hair or hairstyles), or defamation.

The court dismisses any claims plaintiff asserted under the additional federal statutes (Titles I and V), which clearly are not relevant to the conduct alleged in the complaints.  Because all federal claims asserted by plaintiff are to be dismissed, the court declines to exercise supplemental jurisdiction over any potential state statutory or common law claim plaintiff has asserted in his laundry list, including defamation.[38]

---

[38]  "Under New York law, the elements of defamation are a (1) false statement, (2) published without privilege or authorization to a third party, (3) constituting fault with negligence or actual malice depending on the status of the defamed party, and (4) special damages or per se actionability."  *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 452 (S.D.N.Y. 2018) (citing, *inter alia*, *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d

"A court may decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it has original jurisdiction." *Smith v. Da Ros*, 777 F. Supp. 2d 340, 366 (D. Conn. 2011) (citing 28 U.S.C. § 1367(c)(3); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)).

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion for summary judgment (Dkt. No. 81) is **DENIED**; and it is further

**ORDERED** that defendant's motion for summary judgment (Dkt. No. 82) is **GRANTED**; and it is further

**ORDERED** that plaintiff's claims are **DISMISSED WITH PREJUDICE**, with the exception of any claims plaintiff asserted under the New York Labor Law ("NYLL") §§ 203-e and 239; "NY HRL Bill- 07797"; and for common law defamation, which are **DISMISSED WITHOUT PREJUDICE**, as the court has declined to exercise supplemental jurisdiction over any such claims.

Dated:  May 2, 2022

Andrew T. Baxter
U.S. Magistrate Judge

---

163, 176 (2d Cir. 2000)).  "It is well established that "[a] statement of pure opinion is not actionable" in a defamation action.  *Hammer v. Amazon.com*, 392 F. Supp. 2d 423, 431 (E.D.N.Y. 2005); *Hillel v. IQVIA, Inc.*, No. 21-666-CV, 2022 WL 905852, at *2 (2d Cir. Mar. 29, 2022) ("New York appellate courts have held that . . . vague workplace critiques are not actionable" as defamation) (citation omitted).  Plaintiff seemed to assert defamation in connection with the unkind opinions expressed about him by two non-managerial Walmart employees–D.T. and R.Q.–neither of whom are named as defendants.  Thus, it does not appear that plaintiff would be able to assert a viable claim of common-law defamation against Walmart.